AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
9/18/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: KMA DEPTUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
9/18/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: VV DEPUTY

United States of America

v.

Lee Reiber, and
Oleg Sergeyevich Davydov,

Defendants

Case No. 2:26-mj-05499-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 2022 to present, in the county of Los Angeles in the Central District of California, and elsewhere, the defendant violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ William S. Jones*
*Complainant's signature*

William S. Jones, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: September 18, 2026

Karen L. Stevenson
*Judge's signature*

City and state: Los Angeles, California

Hon. Karen Stevenson, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, William S. Jones, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. This affidavit is submitted in support of a criminal complaint and arrest warrants against Lee Reiber ("REIBER") and Oleg Sergeyevich Davydov ("DAVYDOV") for a violation of 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud).

2. I am familiar with the facts and circumstances described herein. This affidavit is based upon my personal involvement in this investigation, my training and experience, my review of search warrant returns and other records, and information obtained from various law enforcement personnel and witnesses, including information that has been reported to me either directly or indirectly. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrants, and does not purport to set forth all my knowledge of, or investigation into, this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only; all numbers, dates, times, and calculations are approximations; and the words "on or about" and "approximately" are omitted for clarity. In addition, some of the documents and conversations referenced in this Affidavit were in Russian and have been translated into English using agency translators or machine translation tools.

## II. BACKGROUND OF THE AFFIANT

3. I have served as a Special Agent for over nine years and have been an Agent with the United States Department of Commerce ("DOC"), Bureau of Industry and Security ("BIS") since April 2024. I am currently assigned to the Cyber Investigation Unit in Manassas, Virginia, where I specialize in the investigation of cyber and high-technology crimes as well as investigations into

Information Communication Technology Systems ("ICTS") compromise. Prior to serving as a Special Agent with BIS, I was a Special Agent within the Department of Defense for seven years, where I investigated numerous cases covering a myriad of federal and military offenses.

4. During my time as a Special Agent, I have been assigned to units conducting cyber and complex fraud investigations, and I have participated in numerous domestic and international cyber-related investigations into the type of criminal activity described within this Affidavit. Additionally, I have completed significant training and education programs in complex investigations with an emphasis on cybercrime, and as a result of my training, education, and experience, I am familiar with the tactics, methods, and techniques utilized by individuals involved in illicit criminal activity.

## III. RELEVANT INDIVIDUALS AND ENTITIES

5. Oxygen Forensics, Inc. ("OXYGEN US") was a company based in Alexandria, Virginia. Among other things, OXYGEN US sold digital forensics software (the "FORENSIC SOFTWARE") to customers around the world, including U.S. government agencies.

6. OXYGEN US was wholly owned by Oxygen Forensics Ltd. ("OXYGEN CYPRUS"), a company incorporated under the laws of the Republic of Cyprus.

7. MKO-Systems, LLC ("OXYGEN RUSSIA") was a company organized under the laws of the Russian Federation. OXYGEN RUSSIA employed the software developers responsible for developing the FORENSIC SOFTWARE, which OXYGEN RUSSIA sold in Russia under different product names to

customers that included the Russian Federal Security Service ("FSB"),[1] the Russian Investigative Committee, and the Russian Ministry of Internal Affairs. Until September 2022, OXYGEN RUSSIA was known as Oxygen Software, LLC.

8. OXYGEN US, OXYGEN CYPRUS, and OXYGEN RUSSIA are referred to collectively herein as "CO3." CO3's ownership structure, both as it appeared on public filings and as it operated in practice, is described in detail below.

9. REIBER, a U.S. citizen, joined OXYGEN US as its Chief Operating Officer ("COO") in August 2015.[2] An amended annual report filed with the Commonwealth of Virginia ("Virginia") on March 30, 2022, listed REIBER as OXYGEN US's Chief Executive Officer ("CEO"), and he has served in that role since at least 2022. REIBER managed OXYGEN US's day-to-day operations from his residence in Boise, Idaho.

10. DAVYDOV, a citizen and resident of the Russian Federation ("Russia"), co-founded OXYGEN RUSSIA in 2000. He served as CO3's Chief Technology Officer ("CTO"), responsible for the development of the FORENSIC SOFTWARE. DAVYDOV was one of CO3's owners. He also helped establish OXYGEN US in 2013 and was listed as OXYGEN US's Vice President in U.S. corporate filings. In June 2022, following the expansion of U.S. sanctions against Russia in response to Russia's further invasion of Ukraine, DAVYDOV was removed from OXYGEN US's corporate filings. DAVYDOV and Co-

---

[1] Based on my training and experience, I know that the FSB, the main successor to the Soviet Union's KGB, is Russia's principal domestic security and counterintelligence agency.

[2] According to business records, REIBER was hired in August 2015. An August 2015 article in Forensic Focus announced REIBER's appointment as COO. Virginia business filings did not list REIBER as OXYGEN US's COO until February 2018.

Conspirators-1 through 4 are referred to collectively herein as the "SHAREHOLDERS."

11. Co-Conspirator-1, a Russian citizen who resided primarily in Russia, co-founded OXYGEN RUSSIA with DAVYDOV in 2000 and established OXYGEN US in 2013. He served as CO3's CEO and President of its Board of Directors, and was responsible for CO3's international operations, software development, and corporate strategy. Co-Conspirator-1 was one of CO3's owners. Co-Conspirator-1 was removed from OXYGEN US's corporate filings in June 2022. According to those filings, however, he rejoined OXYGEN US's executive management and Board of Directors in November 2024 but under a different name and identity, using a Turkish passport he had obtained in 2023.

12. Co-Conspirator-2, a Russian citizen, held roles at OXYGEN RUSSIA beginning no later than June 2013. Co-Conspirator-2 initially served as OXYGEN RUSSIA's Marketing Director and later was named CO3's Chief Marketing Officer. Co-Conspirator-2 was one of CO3's owners.

13. Co-Conspirator-3, a Russian citizen, held roles at OXYGEN RUSSIA beginning no later than 2002. Russian business records listed Co-Conspirator-3 as a former Director of OXYGEN RUSSIA. Co-Conspirator-3 was one of CO3's owners and focused on software development and strategy.

14. Co-Conspirator-4, a Russian citizen, held roles at OXYGEN RUSSIA beginning no later than 2002. Co-Conspirator-4 handled invoices between OXYGEN US and OXYGEN CYPRUS, managed contracts with outside vendors, and worked on CO3's software development team. Co-Conspirator-4 served on CO3's Board of Directors and was one of CO3's owners.

15. Co-Conspirator-5, a Russian citizen, initially managed the Support Department for OXYGEN RUSSIA and OXYGEN US. In 2016, at the SHAREHOLDERS' direction, Co-Conspirator-5 relocated from Russia to Cyprus

and registered OXYGEN CYPRUS. Co-Conspirator-5 has served as OXYGEN CYPRUS's Director since 2016. Co-Conspirator-5 was not an owner of CO3.

## IV. SUMMARY OF PROBABLE CAUSE

16. From at least March 2022, and continuing through the present, within the Central District of California and elsewhere, defendants REIBER and DAVYDOV, together with others known and unknown, knowingly and intentionally conspired to commit wire fraud, in violation of 18 U.S.C. § 1349. The object of the conspiracy was to obtain money from U.S. law enforcement agencies, namely, components of the U.S. Department of Homeland Security ("DHS")—the U.S. Secret Service ("Secret Service"), including its National Computer Forensics Institute ("NCFI"); Homeland Security Investigations ("HSI"); and the DHS Office of Inspector General ("DHS OIG")—and the U.S. Department of Defense ("DOD") (collectively, the "U.S. GOVERNMENT CUSTOMERS") by selling them the FORENSIC SOFTWARE, while falsely representing that no foreign person owned or controlled OXYGEN US and that the FORENSIC SOFTWARE was developed in the United States.

17. In truth, OXYGEN US was owned and controlled by DAVYDOV and the other four SHAREHOLDERS, who were Russian nationals and residents. The SHAREHOLDERS owned OXYGEN CYPRUS, which in turn owned 100% of OXYGEN US; they also owned OXYGEN RUSSIA, whose customers included the FSB and other Russian security services. A software development team, located primarily in Russia and directed by DAVYDOV, wrote and maintained the FORENSIC SOFTWARE for all three companies. The three companies held themselves out as independent, but the SHAREHOLDERS directed the management of each entity.

18. After the United States introduced more stringent sanctions on Russia in early 2022 in response to Russia's war of aggression in Ukraine, DAVYDOV,

the other SHAREHOLDERS, and REIBER conspired and agreed to conceal the SHAREHOLDERS' ownership and control of OXYGEN US. They removed DAVYDOV and the other SHAREHOLDERS from OXYGEN US's public corporate filings, installed REIBER as CEO, President, and Chairman of the Board, and amended the company's charter so that, in the words of one SHAREHOLDER, "fateful decisions" would continue to be made by the SHAREHOLDERS. The SHAREHOLDERS thereafter continued to set REIBER's compensation, overrule him on payments, and hold signatory authority over OXYGEN US's bank accounts. REIBER continued to take their direction, while the SHAREHOLDERS resided in and operated from Russia.

19. To sell the FORENSIC SOFTWARE to the U.S. GOVERNMENT CUSTOMERS, REIBER certified in OXYGEN US's annual Representations and Certifications in the U.S. Government's System for Award Management, on December 26, 2022 and October 27, 2023, that OXYGEN US had no immediate owner and no highest-level owner; and on October 15, 2024 and September 9, 2025, that OXYGEN US had no highest-level owner. Each certification was false. At the time of these certifications, REIBER had signed a certificate in 2021 stating that OXYGEN CYPRUS owned 100% of OXYGEN US, and in June 2022 he had told OXYGEN US's tax preparer in writing that the SHAREHOLDERS owned OXYGEN CYPRUS. The U.S. GOVERNMENT CUSTOMERS' award files incorporated those certifications, and their procurement officials have stated that they would not have awarded or renewed contracts for the FORENSIC SOFTWARE had they known OXYGEN US was Russian-owned or controlled.

20. REIBER and the SHAREHOLDERS also concealed that the FORENSIC SOFTWARE was developed in Russia. REIBER knew from 2018 that the U.S. Government had security concerns about Russian-developed software, and he was told in writing in January 2024 that foreign government customers would

not buy the FORENSIC SOFTWARE if its development in Russia were disclosed. In March 2022, he and DAVYDOV arranged for REIBER to initiate the software build on U.S.-based cloud infrastructure so that REIBER, in his words, could "say this is what 'I' do or what 'We' do in the US," while the code continued to be written, reviewed, and managed by the team in Russia. REIBER thereafter caused OXYGEN US to present itself to the Secret Service as a "forensic software development company" and "an American company," and in 2026 he and OXYGEN US's Vice President of Operations told DHS that no member of the development team was based in Russia and that no person in Russia had any role in developing the software or any access to its development environment.

21. REIBER understood that disclosure of the truth would end OXYGEN US's business with the U.S. GOVERNMENT CUSTOMERS. In November 2023, after a competitor's accusation prompted a reporter to ask about OXYGEN US's ownership and its connection to OXYGEN RUSSIA, REIBER wrote to DAVYDOV and two other SHAREHOLDERS that public reporting "could destroy this entire opportunity" with NCFI and that "[t]he current existence of this company hangs in the balance." REIBER proposed to DAVYDOV and the other SHAREHOLDERS that OXYGEN US distance itself from the OXYGEN RUSSIA connection. Two months later, REIBER sent DAVYDOV and Co-Conspirator-1 a draft response to the competitor that falsely stated that OXYGEN US had no knowledge of developmental processes or included code. In September 2024, NCFI awarded a five-year, $12 million-ceiling contract for the FORENSIC SOFTWARE on an award file containing REIBER's October 2023 certification.

22. When news reports in February 2026 identified OXYGEN US as Russian-owned, REIBER and OXYGEN US's Vice President of Operations told NCFI in writing that OXYGEN US was not owned or controlled by any Russian entity and that no member of the development team was based in Russia. On

March 6, 2026, in a recorded call with undercover agents posing as DHS contracting personnel in the Central District of California, REIBER denied that any Russian citizen or person in Russia had any ownership interest in or control over OXYGEN US, any role in developing the FORENSIC SOFTWARE, or any access to the environment in which it was developed, and stated that those denials had been true since 2022. OXYGEN US then published a website, with a statement authored by REIBER, repeating those denials; a DHS digital forensics supervisor in the Central District of California accessed the site on September 17, 2026.

23. After June 7, 2022, the U.S. GOVERNMENT CUSTOMERS awarded contracts and made purchases for the FORENSIC SOFTWARE totaling more than $2 million, including the Secret Service's 2023 licensing contract, its 2024 and 2025 renewals, and the 2024 NCFI contract. REIBER's certifications were transmitted by wire from Idaho to the U.S. Government's SAM servers; his March 6, 2026 statements were transmitted by wire from Idaho to the Central District of California; and the trust website was accessed by wire in the Central District of California.

24. For these reasons, and as set forth in detail below, there is probable cause to believe that REIBER and DAVYDOV conspired to commit wire fraud, in violation of 18 U.S.C. § 1349.

## V. STATEMENT OF PROBABLE CAUSE

### A. Corporate Organizational Structure and Control Systems of CO3

25. OXYGEN RUSSIA, OXYGEN CYPRUS, and OXYGEN US existed as three separate legal entities. OXYGEN US and OXYGEN CYPRUS publicly represented that they were independent of OXYGEN RUSSIA. OXYGEN US also publicly represented that, although it was owned by OXYGEN CYPRUS, the Cypriot company did not exercise control or influence over OXYGEN US's operations. As set forth below, however, I believe that the three entities operated as

part of a single corporate structure owned and controlled by the SHAREHOLDERS.

26. CO3 sold host-based, network- and endpoint deployable, and cloud-hosted digital forensic collection and analysis software. The FORENSIC SOFTWARE solutions sold in and outside of Russia were fundamentally the same products, developed by the same software development team. CO3 marketed them under different names in the two markets to conceal the shared ownership and development. In Russia, CO3 sold the FORENSIC SOFTWARE as MK Desktop, MK Expert Plus, and MK Enterprise. Outside Russia, CO3 sold the FORENSIC SOFTWARE as Oxygen Forensics Detective, Oxygen Review Center, and Oxygen Remote Explorer.

27. Email and Google account data obtained pursuant to federal search warrants revealed that the SHAREHOLDERS conducted internal deliberations through a series of shared electronic platforms. Between 2016 and 2020, the SHAREHOLDERS used a private Facebook workspace named "Генштаб" (transliterated "Genstab," meaning "General Staff") for leadership discussions. By July 2020, the SHAREHOLDERS transitioned from Facebook to Word documents (the "SHAREHOLDER Documents") shared via cloud infrastructure. In 2022, these SHAREHOLDER Documents were moved onto Google infrastructure and converted into Google documents shared among the SHAREHOLDERS, including DAVYDOV, through dedicated U.S.-based Google Accounts.[3] Those U.S.-based Google accounts were separate from the SHAREHOLDERS' personal Google Accounts and their official oxygen-forensic.com and oxygensoftware.ru email accounts.

[3] Each SHAREHOLDER created a Google Account using the naming convention "Firstname.US.Lastname@gmail[.]com."

28. The SHAREHOLDER Documents addressed a range of topics, including company strategy, billing, software development, and compliance issues. Those discussions included both compliance with U.S., Cypriot, and Russian laws and strategies for concealing violations of those laws. After Russia's further invasion of Ukraine in 2022, the documents focused on circumventing sanctions on Russian banks and the problem with "[a] 'Russian' company in the states [sic]."[4] Co-Conspirator-1 created the SHAREHOLDER documents from his Google Account and then shared the documents with the other SHAREHOLDERS, including DAVYDOV.[5] Approximately 17 SHAREHOLDER documents were drafted between March 9, 2022, and August 9, 2024,[6] and these documents focused on maintaining control over each element of CO3. For example, in a document titled "Генштаб, 29 марта 2022" (meaning General Staff, March 29, 2022), Co-Conspirator-1 reported OXYGEN US's charter had been amended to ensure that "fateful decisions" would remain with the SHAREHOLDERS.

29. The Russia-based SHAREHOLDERS controlled OXYGEN US and OXYGEN CYPRUS from the inception of each entity. Emails and other electronic communications obtained pursuant to federal search warrants showed that at all relevant times, the SHAREHOLDERS regularly directed REIBER, who ran OXYGEN US, and Co-Conspirator-5, who ran OXYGEN CYPRUS, on the

[4] Unless otherwise noted, Russian-language documents quoted in this affidavit, including the SHAREHOLDER Documents, were translated into English using automated machine-translation software rather than by a human translator. Machine translations are generally reliable for conveying the substance of a document, but they can misrender idioms, specialized vocabulary, and nuances that a certified human translation might otherwise capture.

[5] Analysis of JavaScript Object Notation ("JSON") files associated with the SHAREHOLDER Documents revealed the creator of each document, the SHAREHOLDERS with whom the document was shared, and, for some documents, comments the SHAREHOLDERS added to the files.

[6] This figure includes SHAREHOLDER Documents with notable changes or from different dates, rather than every version of each document.

management and strategic direction of each company and on each company's role within CO3's business strategy.

a. On May 7, 2024, for example, Co-Conspirator-1 emailed REIBER and Co-Conspirator-5, warning that the SHAREHOLDERS would replace them if they could not resolve difficulties transferring the proceeds of FORENSIC SOFTWARE sales from the United States to Cyprus. Co-Conspirator-1 criticized REIBER for failing to pay OXYGEN US's bills on time and Co-Conspirator-5 for "choosing stupid banks that delay payments." Co-Conspirator-1 concluded, "I'm tired of explaining to both of you that on-time payments are vital."

b. In another example, in July 2024, REIBER objected to granting Co-Conspirator-1 administrative access to OXYGEN US's Gusto Human Resources and Payroll ("Gusto") platform, which OXYGEN US used only for its U.S.-based employees. In response, on July 29, 2024, Co-Conspirator-1 emailed REIBER, "As your boss, I should have all the company-related information that you have." REIBER subsequently granted Co-Conspirator-1 access.

**B. The SHAREHOLDERS' Efforts to Distance OXYGEN RUSSIA from OXYGEN US**

30. OXYGEN RUSSIA was the primary distributor of the FORENSIC SOFTWARE within the Russian Federation. Its customers included the FSB, the Russian Investigative Committee ("SKR"), and the Russian Ministry of Internal Affairs. OXYGEN RUSSIA thus sold the same software under different branding to the Russian security services that OXYGEN US was concurrently selling to U.S. federal law enforcement agencies.

1. OXYGEN RUSSIA's formation

31. Publicly available Russian business records[7] indicated that Co-Conspirator-1 and DAVYDOV formed OXYGEN RUSSIA (then Oxygen Software LTD) in 2000 as a software development firm that later specialized in mobile device, drone, and cloud digital forensics. From 2000 to 2015, OXYGEN RUSSIA was located at the same Moscow address as the Moscow Scientific Research Institute of Radio Communication ("MNIIRS"), a joint stock company owned by the Russian Government's Federal Communications Agency, and MNIIRS owned 25% of OXYGEN RUSSIA's stock; Co-Conspirator-1 owned 51%, DAVYDOV 18%, and Co-Conspirators-3, -4, and -5 owned 2% each. Following a 2015 reorganization, MNIIRS and Co-Conspirator-5 were no longer listed as stockholders, and Co-Conspirator-2 became a stockholder in 2020. OXYGEN RUSSIA changed its name to MKO-Systems, LLC in 2022, as described below.

2. Renaming of OXYGEN RUSSIA and Establishment of Separate Domains for OXYGEN RUSSIA and OXYGEN US

32. The SHAREHOLDERS' concealment efforts extended to OXYGEN RUSSIA's public identity. In a SHAREHOLDER Document titled "Генштаб, 4 августа 2022" (General Staff, 4 August 2022),[8] the SHAREHOLDERS discussed the need to change OXYGEN RUSSIA's name to prevent anyone from identifying the link between OXYGEN US and OXYGEN RUSSIA by searching the Russian Unified States Register of Legal Entities. The SHAREHOLDERS decided to

[7] Russian business records were found and corroborated through a number of open-source records, including TAdviser.com and Forbes.com.

[8] Machine translated.

change the company's and its products' names and to establish separate internet domains for OXYGEN RUSSIA and OXYGEN US customers.[9]

33. The SHAREHOLDERS acted on that decision. On September 22, 2022, OXYGEN RUSSIA formally changed its name to MKO-Systems.[10] On December 8, 2023, the SHAREHOLDERS launched the mko-systems.ru domain for OXYGEN RUSSIA, separating OXYGEN RUSSIA's public web presence from OXYGEN US's. These steps were designed to make it difficult for a customer, regulator, or investigator to trace the connection between the two entities.[11]

3. Concealment of the SHAREHOLDERS' ownership of OXYGEN RUSSIA

34. In November 2023, the SHAREHOLDERS took a further step to conceal their continuing ownership of OXYGEN RUSSIA. OXYGEN RUSSIA's ownership documents were changed to list Prostranstvo IT, a Private Joint Stock Company incorporated in Russia that same month, as OXYGEN RUSSIA's sole owner, replacing the SHAREHOLDERS in the public records.[12]

35. Prostranstvo IT shared the same physical address as OXYGEN RUSSIA. Prostranstvo IT's listed director also served as director of VTB Registrar Closed Joint Stock Company, an entity sanctioned by the U.S. Department of the

---

[9] Prior to 2023, oxygen-forensic.com was used globally by employees of OXYGEN US and OXYGEN RUSSIA in email communications. Between August 2022 and February 2023, the SHAREHOLDERS separated domain usage, creating a new Russian Top-Level Domain (TLD) for OXYGEN RUSSIA and launching oxygenforensics[.]com in the U.S.

[10] Based on open-source Russian business records.

[11] Based on historic Domain Name Server ("DNS") records.

[12] Based on open-source Russian business records.

Treasury's Office of Foreign Assets Control ("OFAC") as owned and controlled by the Russian Government.[13]

36. A search of Russian business filings, international business databases, and various international and Russian search engines revealed that Prostranstvo IT had no reported revenue, no presence outside Russia, and no current or historical web presence, and that no record of the company existed apart from the Russian business filings themselves. Based on my training and experience, entities with little to no business operations and few or no assets are shell companies frequently used to conceal the ownership of other business entities. Prostranstvo IT's function here appears to be to conceal the SHAREHOLDERS' continuing ownership of OXYGEN RUSSIA.

37. Documents obtained pursuant to federal search warrants of Co-Conspirator-1's and DAVYDOV's Google accounts revealed that both held ownership shares in Prostranstvo IT. Co-Conspirator-2, -3, and -4 continued to participate in SHAREHOLDER Documents and decisions affecting OXYGEN RUSSIA and the broader CO3 structure, indicating that they retained ownership interests in OXYGEN RUSSIA as well. The November 2023 ownership transfer thus did not divest the SHAREHOLDERS of ownership; it interposed a shell company to obscure their continued ownership of OXYGEN RUSSIA.

4. The "Citadel" scenarios: SHAREHOLDER planning around Russian Government control

38. Between February and May 2023, in a SHAREHOLDER Document titled "Генштаб, Цитадель" (General Staff, Citadel),[14] the SHAREHOLDERS, including DAVYDOV, considered three scenarios in which the Russian

---

[13] See https://home.treasury.gov/news/press-releases/jy0608.

[14] The title and document were translated by a U.S.-Government contracted translator.

Government would seek ownership or control of CO3. Under the first scenario, the SHAREHOLDERS would retain ownership of CO3 but would "begin assisting in surveillance," and the document contemplated partial ownership of OXYGEN RUSSIA by a structure affiliated with the FSB, noting the risk of global sanctions if that arrangement became public. Under the second scenario, the Russian Government would take ownership of OXYGEN RUSSIA while the SHAREHOLDERS retained the rest of CO3. Under the third scenario, the Russian Government would overtly assume control of the entire CO3 structure, an outcome the SHAREHOLDERS considered unlikely because the resulting sanctions would effectively eliminate OXYGEN US and OXYGEN CYPRUS.

39. The Citadel discussion illustrates that the SHAREHOLDERS understood that public disclosure of Russian Government involvement in CO3 would likely end its business outside Russia, and that they contemplated assisting the Russian Government with surveillance using the same software they were selling to U.S. law enforcement, provided the arrangement remained concealed.

### C. The SHAREHOLDERS Formed OXYGEN US in 2013 and Installed Themselves as Its Officers and Directors

40. OXYGEN US was headquartered in Alexandria, Virginia, and served as the primary distributor and reseller of the FORENSIC SOFTWARE outside of Russia.

41. In 2011, DAVYDOV, Co-Conspirator-1, Co-Conspirator-3 and Co-Conspirator-4 moved distribution of the FORENSIC SOFTWARE to U.S.-based Amazon Web Services ("AWS") Infrastructure.

42. On February 20, 2013, DAVYDOV, Co-Conspirator-1, Co-Conspirator-3, and Co-Conspirator-4 formed OXYGEN US, retaining an attorney

and member of the Virginia State Bar ("Co-Conspirator-6"), to incorporate the company in Virginia.[15]

43. OXYGEN US's initial business filings listed Co-Conspirator-1 as CEO and President, DAVYDOV as the Vice President and Secretary, and Co-Conspirator-6's son as the Assistant Secretary. In 2018, OXYGEN US's annual filings removed Co-Conspirator-6's son as an officer and added REIBER as Chief Operating Officer. The company's 2020 annual filing added Co-Conspirator-2 as Chief Marketing Officer. Until March 2022, OXYGEN US's public filings accurately reflected that Russian nationals held its senior management offices.

### D. OXYGEN CYPRUS Was Owned by the SHAREHOLDERS and Did Not Develop the FORENSIC SOFTWARE

44. On January 19, 2016, Co-Conspirator-5 registered SaferWorld Forensics LTD in Cyprus, and in 2019 the company changed its name to Oxygen Forensics Limited ("OXYGEN CYPRUS"). Co-Conspirator-5 was listed as the Director of OXYGEN CYPRUS, and after its formation in 2016, ownership of the trademark for the name "Oxygen Forensic" was transferred to OXYGEN CYPRUS. OXYGEN CYPRUS purportedly developed and held the intellectual property rights pertaining to the FORENSIC SOFTWARE.

45. As set forth in Section J, based on emails obtained via federal search warrants, financial records, statements by REIBER, and AWS infrastructure logging data, I believe that OXYGEN CYPRUS was owned by the SHAREHOLDERS and did not develop the FORENSIC SOFTWARE. OXYGEN CYPRUS employed no software developers, and no connections to OXYGEN US's AWS development environment originated from Cyprus.

[15] Co-Conspirator-6 has been listed as OXYGEN US's Registered Agent since its incorporation in 2013.

### E. After the February 2022 Sanctions, the SHAREHOLDERS Removed Themselves from OXYGEN US's Public Filings But Retained Control of the Company

46. Following the imposition of enhanced sanctions after Russia's further invasion of Ukraine in February 2022, DAVYDOV and the other SHAREHOLDERS began to discuss the problem posed by having what they described as a "Russian" company in the United States.

47. In a SHAREHOLDER Document titled "Генштаб, 29 марта 2022" (General Staff, March 29, 2022), Co-Conspirator-1 reported that they would remove the SHAREHOLDERS from their positions as directors and officers on OXYGEN US's public filings. Co-Conspirator-1 further reported that Co-Conspirator-6 would amend OXYGEN US's charter to make REIBER the CEO, President, and Chairman of the Board, while ensuring that "fateful decisions will be made by [the SHAREHOLDERS]." DAVYDOV, who was OXYGEN US's Vice President and Secretary at the time, was among the recipients of that document and among the officers proposed for removal from OXYGEN US's public filings.

48. At Co-Conspirator-1's request, REIBER agreed to be listed as occupying the management positions the SHAREHOLDERS were vacating, while the amended charter left actual decision-making authority with the SHAREHOLDERS. REIBER's later conduct confirmed he understood the concerns motivating the arrangement. For example, in April 2024, when Co-Conspirator-1 informed him that Co-Conspirator-1 would be rejoining the Board of Directors under his Turkish alias, REIBER objected that "we removed all non-U.S. persons for clear, and specific reasons."

49. To implement the plan, Co-Conspirator-6 filed an amended Annual Report on March 30, 2022, naming REIBER as CEO, President, and Chairman of the Board and changing the addresses of DAVYDOV, Co-Conspirator-1, and Co-

Conspirator-2 from Russia to the United States. On June 7, 2022, he submitted, or caused the submission of, a second amended Annual Report removing those three individuals from OXYGEN US's filings entirely. Nothing in the record reflects any objection by DAVYDOV to his removal. In the same weeks, he was working with REIBER to give REIBER a nominal role in the software build so that, as REIBER wrote to DAVYDOV, REIBER could "say this is what 'I' do or what 'We' do in the US."

50. In November 2024, Co-Conspirator-1 returned to OXYGEN US's public filings, but not under his own name. Amended filings submitted on November 14, 2024, stripped REIBER of every title except CEO and added "Fatih Osman" as OXYGEN US's President and Secretary. The 2025 and 2026 annual filings listed Osman as President, Secretary, and Chairman of the Board. As evidenced by a comparison of Co-Conspirator-1's Russian passport and "Osman's" Turkish passport, Osman was Co-Conspirator-1, using a Turkish identity he obtained in 2023. To anyone consulting OXYGEN US's public filings, the company's President and Chairman appeared to be a Turkish national rather than the Russian citizen who had been removed from those same filings in June 2022.

1. Co-Conspirator-6 assisted the SHAREHOLDERS notwithstanding sanctions that prohibited his services

51. Co-Conspirator-6 and his law firm provided trust and corporate formation services to the SHAREHOLDERS by serving as OXYGEN US's registered agent and registered office. Beginning on June 7, 2022, those services were prohibited.

52. On April 6, 2022, Executive Order 14071 imposed new sanctions and prohibited new investment and the export of certain services to the Russian Federation, and prohibited any conspiracy to evade or violate the prohibition. On

May 8, 2022, OFAC issued a Determination (the "Determination") that prohibited, without a license:

> the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of accounting, trust and corporate formation, or management consulting services to any person located in the Russian Federation.

The Determination took effect on June 7, 2022, and excluded services provided to entities located in Russia owned or controlled by a U.S. person and services connected to winding down or divesting from a company in Russia, provided that the entity is not owned or controlled by a Russian person.

53. On the day OFAC issued the Determination, Co-Conspirator-6's law firm published an article on its website describing the prohibition, noting its June 7, 2022 effective date, and quoting OFAC's definition of covered services as including "arranging for other persons to act as directors," "acting . . . [as] registered agents," and "providing registered office, business address, correspondence address, or administrative address for legal persons." Under the heading "Summary of the Ramifications," the article advised that "U.S. persons, including attorneys, may not provide any of the services discussed above . . . to persons located in the Russian Federation after June 7, 2022," absent a general or specific license. In May 2025, at the request of investigators, OFAC provided a License Determination confirming that the services Co-Conspirator-6 provided would have been prohibited, that no general license authorized them, and that no specific license was sought by or issued to Co-Conspirator-6, his law firm, REIBER, or OXYGEN US.

54. Co-Conspirator-6 nonetheless continued to serve as OXYGEN US's registered agent and to make filings on the SHAREHOLDERS' behalf. He also arranged for two U.S. citizens to be listed as directors in place of the SHAREHOLDERS: Co-Conspirator-3's brother-in-law and an individual who

provided third-party accounting services to OXYGEN US and the SHAREHOLDERS. Because Co-Conspirator-6 was a member of the Virginia bar and OXYGEN US's registered agent, the filings he made gave the SHAREHOLDERS' concealment of their ownership and control the appearance of legitimacy.

2. The SHAREHOLDERS and Co-Conspirator-6 took additional steps to conceal Russian involvement in OXYGEN US

55. Co-Conspirator-1 recognized that removing the SHAREHOLDERS from OXYGEN US's filings would not erase the public record of their prior roles. In the March 2022 SHAREHOLDER Documents, he acknowledged that the changes would apply only to future filings, and he instructed Co-Conspirator-2 to prepare a statement "from the company and from [Co-Conspirator-1] personally – stating that [Co-Conspirator-1] and all of the 'Russian' [sic] left the company."

56. Between June 7, 2022, and February 24, 2026, Co-Conspirator-6 submitted or caused the submission of at least eight additional OXYGEN US business filings that omitted the SHAREHOLDERS' ownership and control.

57. Since at least June 7, 2022, REIBER, DAVYDOV, and the other SHAREHOLDERS knew that OXYGEN US's Virginia business filings omitted its true ownership and control, and that their public statements on that subject were false. As set forth below, these false statements allowed them to sell and continue selling the FORENSIC SOFTWARE to the U.S. GOVERNMENT CUSTOMERS, who would not have purchased the software had they known that OXYGEN US was owned and controlled by Russian nationals.

**F. REIBER Falsely Certified to the U.S. GOVERNMENT CUSTOMERS that No Foreign Person Owned or Controlled OXYGEN US**

58. Between March 2022 and the present, OXYGEN US sold the FORENSIC SOFTWARE, directly and through resellers, to the U.S.

GOVERNMENT CUSTOMERS, namely, the U.S. Secret Service, HSI, DHS OIG, and DOD. Those agencies awarded contracts and made purchases totaling more than $2 million after June 7, 2022. Each award and purchase rested on REIBER's certifications, described below, that no foreign person owned or controlled OXYGEN US.

1. The SAM Representations and Certifications

59. Any company that contracts with the U.S. Government must complete annual Representations and Certifications ("Reps and Certs") through the System for Award Management ("SAM"). The Reps and Certs include a section titled "Ownership or Control of Offeror," required by Federal Acquisition Regulation 52.204-17, in which the offeror must state whether it has an "immediate owner" or a "highest-level owner" and, if so, identify each. The form defines an immediate owner as "an entity, other than the offeror, that has direct control of the offeror," and states that "[i]ndicators of control include, but are not limited to, . . . ownership or interlocking management, . . . shared facilities and equipment, and the common use of employees." It defines a highest-level owner as "the entity that owns or controls an immediate owner of the offeror, or that owns or controls one or more entities that control an immediate owner of the offeror." Each submission concludes with a certification that the submitter understands he "may be subject to criminal prosecution under Section 1001, Title 18 of the United States Code."

60. OXYGEN US's then-operations manager, at REIBER's instruction, submitted the company's annual Reps and Certs on August 19, 2022. REIBER submitted, or caused to be submitted, the company's Reps and Certs on December 26, 2022, October 27, 2023, October 15, 2024, and September 9, 2025.[16] SAM log

[16] SAM logs revealed REIBER's OXYGEN US email account was used to log in and submit the filings, and the IP addresses from these submissions matched IP addresses from REIBER's OXYGEN US Microsoft account and his personal Google account data.

records show that each of REIBER's submissions was made from his SAM account, authenticated by two-factor login, from IP addresses associated with his residences in Idaho or with a proxy service he used.

61. In the August 2022, December 2022, and October 2023 submissions, OXYGEN US certified that it had no immediate owner and no highest-level owner. These certifications were false. As set forth in Section D, OXYGEN CYPRUS owned 100% of OXYGEN US's shares, and DAVYDOV and the other SHAREHOLDERS owned and controlled OXYGEN CYPRUS. At the time of these certifications, REIBER knew that the SHAREHOLDERS controlled OXYGEN US through OXYGEN CYPRUS. On March 29, 2021, he had signed a Certificate of Officer stating that OXYGEN CYPRUS owned 100% of OXYGEN US's shares, and on June 10, 2022—six months before his first SAM submission—he had sent that certificate to OXYGEN US's tax preparer with an email stating that the SHAREHOLDERS owned OXYGEN CYPRUS.

62. In the October 2024 and September 2025 submissions, REIBER for the first time identified OXYGEN CYPRUS as OXYGEN US's immediate owner, but certified that OXYGEN US had no highest-level owner. That certification was likewise false. As set forth in Section G, the SHAREHOLDERS owned OXYGEN CYPRUS and exercised the "interlocking management" and "common use of employees" that the form identifies as indicators of control: they set REIBER's compensation, installed Co-Conspirator-1 on OXYGEN US's board, overruled REIBER on payments, held signatory authority over OXYGEN US's bank accounts, and directed a single development team, led by DAVYDOV, that produced the software sold by both OXYGEN US and OXYGEN RUSSIA. REIBER made the October 2024 certification six months after the April 2024 "Summary for 2024-04 Management meeting" thread in which Co-Conspirator-1 froze his salary and announced the board appointment.

2. The SF-328

63. In July 2024, OXYGEN US's Vice President of Operations ("Individual-2") asked REIBER for guidance in completing forms required for sales to U.S. national-security agencies, including a Certificate Pertaining to Foreign Interests (the "SF-328"). Question 3 of the SF-328 asks whether "any non-U.S. citizens serve as members of your organization's board of directors (or similar governing body), officers, executive personnel, . . . or senior management officials." Question 4 asks whether "any foreign person(s) have the power, direct or indirect, to control the election, appointment, or tenure of members of your organization's board of directors . . . or other management positions of your organization, or have the power to control or cause the direction of other decisions or activities of your organization."

64. Individual-2 answered "No" to every question and sent the form to REIBER for review before signing. REIBER responded only to ask whether OXYGEN US needed to disclose contracts with its foreign customers under Question 5.[17] He did not correct the false responses to questions 3 and 4, despite knowing that the SHAREHOLDERS were foreign persons, that Co-Conspirator-1 had just been appointed to the board, and that the SHAREHOLDERS controlled OXYGEN US's decisions. On July 19, 2024, Individual-2 signed the SF-328 together with contract number H98230-24-H-080, a Credit Card Agreement ("CCA") enabling U.S. Government agencies to purchase the FORENSIC SOFTWARE by purchase card. The CCA provided a definition of foreign interest to be used when completing the SF-328, which definition included "[a]ny individual who is not a U.S. citizen" and any U.S. entity "owned, controlled, or influenced by" a foreign person. OXYGEN US submitted the SF-328 containing

[17] Question 5 asked "Does your organization have any contracts, agreements, understandings, or arrangements with a foreign person(s)?"

the false statements regarding the foreign ownership and control of OXYGEN US to the DOD in July 2024.

3. Statements to the Secret Service and the NCFI Award

65. Between 2016 and 2024, the Secret Service awarded seven contracts, directly or through resellers, to OXYGEN US for the FORENSIC SOFTWARE. The award file for each award contract after August 2020 contained OXYGEN US's then-current SAM Reps and Certs, including the false ownership certifications discussed above. The Secret Service Digital Forensics Program Manager responsible for the 2023 award stated that he personally checked OXYGEN US's SAM Reps and Certs before the solicitation and relied on them in the award and in each option-year renewal.

66. Based on interviews with OXYGEN US employees, REIBER considered the Secret Service relationship as the path to a larger multi-year contract with the NCFI, which trains state, local, tribal, and territorial law enforcement personnel and equips its graduates with forensic software. Before the award, OXYGEN US's sales team briefed NCFI leadership and its contracting officer at least three times using a presentation endorsed by REIBER that introduced OXYGEN US as "a forensic software development company founded in 2000," an "America[n] company headquartered in Alexandria, Virginia," and "[a] trusted U.S. company with over 22 years of digital forensics experience." Former employees stated that this messaging came from REIBER.

67. In September 2024, NCFI awarded a five-year, $12,000,000-ceiling IDIQ contract for the FORENSIC SOFTWARE to a reseller, Active Security Consulting, LLC. NCFI paid approximately $744,000 under the contract in 2024 and approximately $725,400 in 2025, and OXYGEN US received corresponding deposits of $706,984 on November 14, 2024 and $689,309 on October 1, 2025.

The award file contained OXYGEN US's October 2023 Reps and Certs, in which REIBER certified that OXYGEN US had no immediate or highest-level owner.

4. REIBER knew that Russian Ownership would end the NCFI opportunity

68. On November 29, 2023—one month after his October 2023 SAM certification and ten months before the NCFI award—REIBER received an inquiry from a Forbes reporter. The inquiry appears to have been prompted by an accusation by Elcomsoft, a Russian competitor, that OXYGEN RUSSIA and OXYGEN US were both using software code reverse-engineered from Elcomsoft's products. The reporter's questions, however, went primarily to the relationship between the two OXYGEN companies and the ownership of OXYGEN US: whether OXYGEN US had "any connection" to OXYGEN RUSSIA; whether Co-Conspirator-1 and DAVYDOV had "any stake/role/connection" to OXYGEN US; whether OXYGEN US licensed its software to OXYGEN RUSSIA or the reverse; why OXYGEN US was owned through a Cyprus entity; "[w]ho owns" OXYGEN US; and who Co-Conspirator-5, the listed director of OXYGEN CYPRUS, was. REIBER forwarded the inquiry from his personal Gmail account to Co-Conspirator-1's and Co-Conspirator-2's OXYGEN RUSSIA email accounts and to DAVYDOV's personal account, writing:

> To be honest I have worked my tail off for the last 8 years to bring [OXYGEN US] to a top tier DFIR industry leader and have worked for the last five years to secure a possible 3M a year tentative contract (which we have secured for March 2024) with a single US entity (NCFI) in the federal space to displace Cellebrite forever and this hits the fan. This could destroy this entire opportunity and any credibility we have built. I am just being completely honest. [Elcomsoft] has gone directly to this guy via Signal I am sure and is backchanneling this to muddy our name. [OXYGEN US] needs to be so far away from this shit storm if we are going to survive. You both know [Elcomsoft] and how [they] will mess with the truth. The current existence of this company hangs in the balance.

69. REIBER's immediate concern was Elcomsoft's accusation. But the accusation mattered to REIBER because answering it truthfully would have required disclosing that OXYGEN US and OXYGEN RUSSIA sold the same software, developed by the same team, and were owned by the same people. REIBER told DAVYDOV and the other SHAREHOLDERS that public disclosure of the connection between OXYGEN RUSSIA and OXYGEN US could cost the company the NCFI contract and threaten the company's existence. His proposed response was for OXYGEN US to be "so far away from" the OXYGEN RUSSIA connection as possible.

70. REIBER followed that strategy. On January 27, 2024, Elcomsoft's chief executive emailed REIBER directly, requesting a call about the alleged theft. REIBER forwarded the email to Co-Conspirator-1 and DAVYDOV—the person who managed the development REIBER proposed to disclaim knowledge of—with a draft response for their review. REIBER proposed to tell Elcomsoft that OXYGEN US "license[s] the tool and ha[s] no knowledge of developmental processes or included code and should hold no liability to what may or may not have happened." As set forth in Section H, REIBER had knowledge of the FORENSIC SOFTWARE's development, having corresponded with DAVYDOV about the build process, release schedules, and the removal of Russian-language labels. His draft response to Elcomsoft was the same false account of OXYGEN US's relationship to the software that he was giving the U.S. GOVERNMENT CUSTOMERS. He submitted his next two SAM certifications denying any highest-level owner after these exchanges.

5. <u>Materiality</u>

71. Procurement officials at the U.S. GOVERNMENT CUSTOMERS have represented that they would not have awarded or renewed contracts for the FORENSIC SOFTWARE had they known that OXYGEN US was a Russian-

owned company. For example, the Secret Service Digital Forensics Program Manager stated that OXYGEN US's ownership was material to the 2023 award and the 2024 and 2025 renewals, and that had he known OXYGEN US was Russian-owned, the Secret Service would not have awarded or renewed the contract. The DHS Deputy Chief Procurement Officer similarly affirmed that had DHS known that OXYGEN US was Russian-owned, DHS would not have awarded contracts for the FORENSIC SOFTWARE.

72. The certifications were also material by their terms. FAR 52.204-17 required the disclosure to the U.S. GOVERNMENT CUSTOMERS, and the U.S. GOVERNMENT CUSTOMERS used ownership information to assess contractor responsibility and foreign-influence risk. In addition, as to the DOD, the SF-328 and CCA expressly conditioned eligibility for national-security agency purchases on the absence of foreign ownership and control.

### G. REIBER Knew that the SHAREHOLDERS, Operating from Russia, Continued to Control OXYGEN US

73. REIBER's actions demonstrated that, since at least June 7, 2022, he knew that the SHAREHOLDERS owned and controlled OXYGEN US, and that they did so from Russia. The SHAREHOLDERS directed OXYGEN US's management and overruled its CEO; they were signatories on its bank accounts; they operated from Russia throughout; and REIBER, knowing all of this, actively concealed the Russian connection when it threatened to surface.

#### 1. <u>The SHAREHOLDERS directed and overruled REIBER</u>

74. In April 2024, in an email thread titled "Summary for 2024-04 Management meeting" Co-Conspirator-1 emailed REIBER, Co-Conspirator-2, and DAVYDOV. Co-Conspirator-1 told REIBER that the SHAREHOLDERS were unhappy with his performance as CEO, and were freezing REIBER's salary at $250,000 per year until OXYGEN US paid its debts to OXYGEN CYPRUS. Co-

Conspirator-1 also told REIBER he should hire an HR director to ensure employee happiness and productivity. Co-Conspirator-1 stated "[i]n the Russian company, hiring an HR director helped me to reduce staff turnover several times over."

75. In the same thread, Co-Conspirator-1 informed REIBER that "Osman" was now a member of the Board of Directors. REIBER replied:

> Ok, but can you explain why this is needed and the benefit to Oxygen Forensics, Inc? As I recall we removed all non-U.S. persons for clear, and specific reasons. Since this is of public record is this needed and advisable?

76. In 2024, the SHAREHOLDERS became concerned that an IRS audit of OXYGEN US—which had reported losses every year from at least 2017 through 2024—would lead the IRS to identify the company's true ownership, and they retained an accounting firm to review OXYGEN US's tax filings and recommend how to avoid an audit. REIBER asked that the bill be sent to OXYGEN CYPRUS, because the SHAREHOLDERS had requested the work. Co-Conspirator-2 overruled him, writing that "[t]hese services were initiated at the direction of a member of [OXYGEN US's] Board of Directors." On August 13, 2024, REIBER paid the accounting firm $52,515 from OXYGEN US's Chase checking account through OXYGEN US's Bill.com account.[18]

2. <u>REIBER knew that the SHAREHOLDERS continued to operate OXYGEN US from Russia After June 2022</u>

77. Since at least February 2021, Co-Conspirator-4, connecting from IP addresses in Russia, utilized his oxygen-forensic[.]com email account and his administrative access to OXYGEN US's Zoho CRM platform to compile OXYGEN US license-sales data and send it to an Estonian company whose

---

[18] Bill.com is a financial operations platform that helps businesses manage accounts payable and accounts receivable, including invoicing, bill payments, and payment collection. It streamlines and automates financial workflows to improve efficiency and reduce manual processing.

password-cracking module was incorporated into the FORENSIC SOFTWARE. That practice did not change after June 7, 2022. The only difference was that Co-Conspirator-4 began connecting through a proxy service to make him appear to be in the United States.

78. Co-Conspirator-2 likewise continued to direct OXYGEN US's marketing and expenses after June 7, 2022. Email records showed REIBER on over 300 emails and meeting invitations with Co-Conspirator-2 in which she exercised authority over OXYGEN US decisions. In October 2023, for example, she circulated to REIBER, Co-Conspirator-3, and DAVYDOV a document she had created setting feature priorities for the next release of Oxygen Analytic Center.

79. Through December 2022, REIBER reviewed and approved Co-Conspirator-1's and Co-Conspirator-2's expense reports, which included receipts for expenses incurred in Russia and paid in rubles. Co-Conspirator-2 submitted her last expense report on December 6, 2022, and Co-Conspirator-1 submitted his last report on December 30, 2022.

80. On February 2, 2023, REIBER emailed Co-Conspirator-1 and Co-Conspirator-2, stating that because of "US sanction to any Russian, now along with our US Commerce scrutiny on exports, OFI must cease reimbursing expenses to you both," and that their future expenses should be reimbursed by OXYGEN CYPRUS. The next day, REIBER told Co-Conspirator-2 that the change was necessary because of "audit exposure." REIBER wrote that she should continue to use OXYGEN US's marketing Divvy card,[19] and that he would have a virtual card created for her CO3 expenses, which REIBER paid from OXYGEN US's Chase bank account. REIBER thus stopped the direct reimbursements that generated ruble-denominated expense reports in OXYGEN US's records, while giving Co-

[19] Divvy is a corporate expense-card platform that allows a company to issue physical and virtual payment cards to individual users.

Conspirator-2 continued access to OXYGEN US's funds without needing to submit ruble-denominated reports.

81. REIBER also knew that the FORENSIC SOFTWARE development team worked from Russia. On March 21, 2024, DAVYDOV emailed REIBER that the team needed DJI drone log files for testing because sanctions on drone exports to Russia made drones difficult to obtain and flying them in Russia was prohibited, so they could not fly them to generate the log files.

82. On June 13, 2024, REIBER emailed DAVYDOV that OXYGEN US's security team had detected logins from Russia through a Microsoft application, that he had previously asked the team to use a VPN, and that he needed DAVYDOV's help to ensure that no one connected directly to the Microsoft application from Russian IP addresses.

83. The SHAREHOLDERS also hid their locations from the U.S. service providers whose platforms OXYGEN US used. In the March 2022 SHAREHOLDER Documents, the SHAREHOLDERS discussed sanctions-related restrictions on Russian IP addresses and agreed to access U.S. accounts only through VPNs with U.S. exit points. Co-Conspirator-4 reported that "[a] server has now been set up in Turkey for access both from outside Russia and from within Russia." Thereafter, login records obtained from Google and Microsoft showed the SHAREHOLDERS' email accounts accessed almost exclusively from IP addresses in Turkey or from U.S.-based proxy and cloud infrastructure, with only sporadic connections from Russia. REIBER knew of the practice: on July 29, 2024, Co-Conspirator-1 told REIBER that a particular IP address belonged to a "dedicated US proxy I bought"—the same address from which Co-Conspirator-1 routinely accessed his oxygen-forensic[.]com account.

3. <u>REIBER concealed the Russian connection when it surfaced</u>

84. Beginning no later than September 2018, REIBER arranged for the chief executive of a U.S.-based digital forensics consulting firm ("Individual-1") to purchase licenses for competing forensic software from vendors including Cellebrite and Magnet Forensics, ostensibly for Individual-1's own use. Individual-1 forwarded the license credentials to REIBER, who forwarded them to DAVYDOV in Russia for the development team.

85. On April 19, 2023, Cellebrite notified Individual-1 that one of his licenses had been suspended because it had connected from an IP address in Russia. Individual-1 forwarded the notice to REIBER, who replied, "[s]hit. I just told the guys they are [expletive] stupid," and supplied Individual-1 with an explanation to give Cellebrite: that the connection reflected "usage of VPN for some extraction tasks." REIBER formatted the suggested language with black highlighting so that it appeared redacted when viewed or printed but was legible when selected. Individual-1 sent the explanation to Cellebrite; the license was reinstated on May 24, 2023; and REIBER emailed DAVYDOV: "Please, please, please do not have these guys forget the VPN again. This cannot happen as it can ruin [Individual-1]'s business. Serious reprocussions [sic]."

86. DAVYDOV's own use of the licenses is documented as well. On August 8, 2024, an IP address assigned to a U.S.-based AWS account logged into Individual-1's Magnet Forensics customer portal and downloaded the full installer for Magnet Axiom version 8.3.1. DAVYDOV's Microsoft account had been accessed from that same IP address that same day.

**H. REIBER and DAVYDOV Knew that the U.S. GOVERNMENT CUSTOMERS Would Not Purchase Software Developed in Russia**

87. In addition to the SHAREHOLDERS' ownership and control, the location of the development of the FORENSIC SOFTWARE was material to the U.S. GOVERNMENT CUSTOMERS. REIBER and DAVYDOV knew that the U.S. GOVERNMENT CUSTOMERS would not buy software developed in Russia. REIBER, DAVYDOV, and the other SHAREHOLDERS also knew that the FORENSIC SOFTWARE was developed in Russia by a team of Russian nationals under the SHAREHOLDERS' direction. In March 2022, REIBER and DAVYDOV constructed a nominal U.S. "build" step so that REIBER could represent the software as made in the United States. The false representations REIBER and Individual-2 then made to the U.S. GOVERNMENT CUSTOMERS about development—that OXYGEN US was "a forensic software development company" and an "America[n] company"; that "no member of the software development team is based in Russia"; that no Russian citizen or person in Russia was involved in developing the FORENSIC SOFTWARE or had access to the environment in which it was developed; and that OXYGEN US maintained no development presence in any restricted jurisdiction—are set forth in Sections F and I.

1. <u>REIBER knew that the U.S. GOVERNMENT CUSTOMERS would not purchase software developed in Russia</u>

88. Well before the charged period, the U.S. Government had publicly identified software developed in Russia as a national-security concern for federal systems. In September 2017, the Department of Homeland Security directed federal agencies to remove Kaspersky Lab products from federal systems, and the Federal Acquisition Regulation was amended to bar contractors from supplying Kaspersky-developed software. In May 2019, Executive Order 13873 declared a

national emergency regarding foreign-adversary threats to the information and communications technology supply chain, and the Department of Commerce promulgated implementing regulations, administered in part by BIS, covering technology developed or supplied by persons subject to the jurisdiction of foreign adversaries, including Russia. In May 2021, Executive Order 14028 directed federal agencies to obtain attestations from software producers regarding the security of the environments in which their software is developed and the provenance of its code.

89. REIBER had specific notice of these restrictions. According to agency records, in 2018, a General Services Administration ("GSA") contracting specialist informed REIBER of a GSA Office of Inspector General finding that the FORENSIC SOFTWARE's source code was developed and compiled outside the United States, and told him in a telephone call that the U.S. Government had security concerns about software developed in Russia. OXYGEN US thereafter withdrew the FORENSIC SOFTWARE from its GSA contract.

90. Procurement officials for the U.S. GOVERNMENT CUSTOMERS have confirmed that the location of the software's development was material to their decisions, and that they would not have purchased or renewed the FORENSIC SOFTWARE had they known it was developed in Russia.

91. REIBER's own conduct shows he understood this. On January 26, 2024, a member of OXYGEN US's European sales team forwarded to OXYGEN US's Director of Sales for Europe and Asia an exchange with the chief executive of one of OXYGEN US's resellers, and asked the director to obtain from REIBER an updated version of the company's standard letter on Russian involvement, explaining that to sell to government agencies in Sweden and Denmark, the letter must "not mention Russian employees or even developers." The director forwarded the request to REIBER. On February 2, 2024, REIBER provided a revised letter

that deleted the prior version's acknowledgment that the company had been founded by Russians and that Russians were involved in developing the FORENSIC SOFTWARE, and stated instead: "[a]ll compilation, coordination, code review, software build and deployment to customers is completed in Virginia, USA." REIBER was told that government customers would not buy if Russian developers were disclosed, and he responded by removing the disclosure. His November 2023 email to DAVYDOV and the other SHAREHOLDERS, warning that public reporting on the connection to OXYGEN RUSSIA "could destroy this entire opportunity" with NCFI, reflects the same understanding, as does the presentation he had OXYGEN US's sales team give NCFI describing the company as "a forensic software development company" and "[a] trusted U.S. company."

92. DAVYDOV knew this as well. He was a recipient of the November 29, 2023, email that REIBER sent after a reporter had asked about OXYGEN US's ownership and its connection to OXYGEN RUSSIA, in which REIBER told DAVYDOV and two other SHAREHOLDERS that public reporting on the connection "could destroy this entire opportunity" with NCFI and that "[t]he current existence of this company hangs in the balance." DAVYDOV thus understood the consequences of public disclosure of the SHAREHOLDERS' joint ownership of OXYGEN US and OXYGEN RUSSIA.

2. <u>REIBER and DAVYDOV Knew that the FORENSIC SOFTWARE Was Developed in Russia</u>

93. Throughout the charged period, the FORENSIC SOFTWARE was developed by a team located in Russia and elsewhere, and managed by DAVYDOV and Co-Conspirator-4, using a U.S.-based AWS environment that Russian nationals administered. OXYGEN US's AWS account was registered in 2011 by Co-Conspirator-4, whose oxygen-forensic[.]com address remained the account's administrative contact through at least March 2026. The account listed

REIBER's name and an OXYGEN US Visa card for billing. Beginning no later than September 2023, Co-Conspirator-4 forwarded to REIBER for payment at least ten AWS invoices, each of which was addressed to the attention of Co-Conspirator-2.

94. REIBER's own role in the build was a workaround he and DAVYDOV constructed in March 2022. In the SHAREHOLDER Documents of March 9 and 29, 2022, the SHAREHOLDERS discussed the "cleanliness" of the AWS operation, referring to Russian developers logging in from Russian IP addresses, and its effect on OXYGEN US's "Americanness." The SHAREHOLDER Documents proposed giving REIBER AWS access and "empowering him to launch builds." On March 23 and 24, 2022, DAVYDOV told REIBER that "[t]here are 5 people having access to admin panel," that source-code management "is a complicated process," and that he was "[n]ot sure yet if we can provide stable work from [Russia] via" a VPN. REIBER asked DAVYDOV to teach him the compilation process so that he "can say this is what 'I' do or what 'We' do in the US to make the product usable." DAVYDOV replied that "the build is a matter that is done automatically," that REIBER need only learn "how to 'push' the button that starts build compilation," and that "the only thing you will need to do is to start the build server instance . . . and perform the command to start the build script." By March 29, 2022, REIBER had been given access, but the code continued to be written, reviewed, and managed in Russia. REIBER's role was to merely run a script the Russian team had written, so that he could say the work had been done in the United States.

95. REIBER's subsequent communications with the SHAREHOLDERS repeatedly reflect his knowledge that the software development remained in Russia. For example, on January 4, 2023, he sent DAVYDOV and Co-Conspirator-2 a screenshot of the Oxygen Analytic Center product showing category labels in

Russian (including “Криптовалюты сленг,” “Cryptocurrency slang,” and “Даркнет сленг,” “Darknet slang”), writing: “Think we need to fix the labels before we can demo this.” In February 2023, DAVYDOV told REIBER the team had implemented antivirus scanning “for the local market (unfortunately, Kaspersky is not an option for international).” In August 2023, DAVYDOV warned REIBER that “massive internal naming fixes” in the software’s binaries might delay the next release. In July 2024, REIBER asked Co-Conspirator-1, DAVYDOV, and Co-Conspirator-2 for an updated product roadmap—a request directed to them because they, not he, controlled the software development. And as set forth in Section G, REIBER knew the software development team worked from Russia because DAVYDOV told him sanctions prevented the team from obtaining drones there and because OXYGEN US’s own security team detected the team’s logins from Russia.

96. On July 30, 2024, OXYGEN US’s Director of Global Sales told REIBER that employees had been asked by a Bulgarian police agency why OXYGEN RUSSIA’s MKO product “was the same as” the FORENSIC SOFTWARE, that the employees believed the MKO product “might have played a role in some other lost opportunities in the past,” and that “the identical and apparently competing product may require an additional statement.” REIBER forwarded the email to DAVYDOV and Co-Conspirator-2, asking “MKO is only sold in Russia, right?”, and then told the Director of Global Sales that the MKO product “is not the same in all features and is only for the Russian market.” As set forth in Section A, the products were the same software developed by the same team.

97. REIBER and DAVYDOV thus knew, throughout the charged period, that the FORENSIC SOFTWARE was written, reviewed, and managed by a team located primarily in Russia working in an environment administered by Russian

nationals, and that REIBER's own role in the build was a script the Russian team had written for him to run. It was against that knowledge that REIBER caused OXYGEN US to present itself to NCFI as a U.S. software development company, and that he and Individual-2 told DHS in 2026 that no one in Russia had any role in developing the software or any access to its development environment.

### I. REIBER's 2026 Denials of Russian ownership and Development to DHS

98. In mid to late February 2026, news reports published on online platforms and Eastern European news sites reported that OXYGEN US was owned by entities associated with the FSB and that several U.S. law enforcement agencies had contracts with OXYGEN US for the purchase of the FORENSIC SOFTWARE.

99. On February 24, 2026, NCFI contracting personnel emailed OXYGEN US requesting a call to discuss "some time sensitive topics." The next day, before any call, Individual-2, OXYGEN US's Vice President of Operations, responded, copying REIBER, that the news reports were based on unsubstantiated statements made by a terminated, disgruntled employee, and stated that OXYGEN US is not owned or controlled by any Russian entity; that OXYGEN US's stock is owned by OXYGEN CYPRUS, but the U.S. company operates independently under U.S. leadership; and that no member of the software development team is based in Russia.

100. On March 6, 2026, undercover agents located in the Central District of California and the Eastern District of Virginia, presenting themselves as DHS contracting personnel following up on Individual-2's email, conducted a recorded video and audio call with REIBER, who participated from Idaho, and Individual-2. The agents told REIBER and Individual-2 that the conversation was material to all of OXYGEN US's contracts with DHS, including the NCFI contract. During the

call, REIBER denied that any Russian citizen or any person located in Russia held any ownership interest in OXYGEN US; denied that any such person had any control over OXYGEN US; denied that any such person was involved in developing the FORENSIC SOFTWARE; denied that any such person had access to the AWS environment in which the FORENSIC SOFTWARE was developed; and stated that each of those denials had been true since he became CEO in 2022.

101. Each of those statements was false, as set forth in Sections A through H, and REIBER knew them to be false when he made them. REIBER's statements were transmitted by wire from Idaho to the agents in the Central District of California and the Eastern District of Virginia.

102. By April 18, 2026, OXYGEN US had published a website at "trust[.]oxygenforensics[.]com," accessible worldwide, addressing the company's ownership, data security, and software development. The site's overview described OXYGEN US as "headquartered in Alexandria, Virginia," stated that it "develops digital forensics software used by law enforcement, government agencies, military organizations, and enterprise investigative teams worldwide," and described a "security governance program aligned with . . . the NIST Cybersecurity Framework." The site offered for download a document titled "Corporate Integrity and Operational Practice Statement," whose metadata shows it was created by REIBER on March 18, 2026. The document stated that OXYGEN US was not owned or controlled by individuals in "restricted jurisdictions," a term it did not define but used in relation to U.S. export-control and sanctions laws, and that the company did not maintain a development or operational presence in any such jurisdiction. Those statements were false for the reasons set forth above.

103. On September 17, 2026, a DHS digital forensics supervisor, working in the Central District of California, accessed the trust[.]oxygenforensics[.]com website and downloaded the Corporate Integrity and Operational Practice

Statement. Based on the statements on the website, the DHS digital forensics supervisor believed OXYGEN US to be a U.S. software development company with controls against the risks the reports had raised.

### J. OXYGEN US's Revenue Was Transferred to OXYGEN CYPRUS for the Benefit of the SHAREHOLDER, Including DAVYDOV

104. The money OXYGEN US received from the U.S. GOVERNMENT CUSTOMERS did not stay with OXYGEN US. Half of the revenue was transferred to OXYGEN CYPRUS under invoices for "royalties" and "licensing fees," and OXYGEN CYPRUS was owned and controlled by the SHAREHOLDERS. The transfers are further evidence that the SHAREHOLDERS, not REIBER, controlled OXYGEN US, and that DAVYDOV and the other SHAREHOLDERS were the beneficiaries of the scheme.

105. Between June 2022 and January 2026, REIBER caused at least 128 wire transfers, totaling approximately $19,052,983, to be sent from OXYGEN US's Chase bank account in the United States to foreign accounts held by OXYGEN CYPRUS. These transfers were routed through OXYGEN US's Bill.com account, using a payment process REIBER established, to accounts located in at least the United Kingdom and Lithuania held by OXYGEN CYPRUS.

106. Each transfer was triggered by an invoice issued by OXYGEN CYPRUS, either sent by Co-Conspirator-5 to REIBER or submitted directly into OXYGEN US's Bill.com account. The invoices characterized the payments as "royalties" or "licensing fees" for the FORENSIC SOFTWARE, calculated as 50% of OXYGEN US's sales.

107. Seventy-four of the 128 transfers, totaling approximately $10,933,000, were in whole-number amounts between $100,000 and $300,000. Based on my training and experience, royalty payments computed as a percentage of actual sales do not ordinarily fall on round hundred-thousand-dollar figures.

This pattern is consistent with periodic transfers sized to the amount the recipient wished to move, rather than with invoice-driven royalty accounting tied to specific sales.

108. Although OXYGEN CYPRUS's public registration listed Co-Conspirator-5 as its sole shareholder and director, OXYGEN CYPRUS was owned and controlled by the SHAREHOLDERS. Co-Conspirator-5 registered OXYGEN CYPRUS (then named SaferWorld Forensics Ltd.) in Nicosia, Cyprus on January 19, 2016, at the SHAREHOLDERS' direction. Emails obtained pursuant to a federal search warrant showed that Co-Conspirator-1, using the address "mt@olegf[.]com," was included on 488 emails between Co-Conspirator-5 and the Cyprus consulting firm that assisted in forming OXYGEN CYPRUS, including the majority of emails concerning the company's organization and tax status; emails that did not initially include Co-Conspirator-1 were forwarded to him.

109. On March 3, 2016, the "Oxygen Forensic" trademark, originally registered by OXYGEN RUSSIA in 2012, was assigned to OXYGEN CYPRUS for one dollar. The Trademark Assignment Agreement reflects that it was executed in Moscow between Co-Conspirator-1 and Co-Conspirator-5.

110. Despite his role in forming and directing OXYGEN CYPRUS, Co-Conspirator-1 denied any connection to it when asked. On November 14, 2018, after being introduced by email to a Cyprus consulting firm as OXYGEN CYPRUS's CEO, Co-Conspirator-1 responded that OXYGEN CYPRUS was not his company.

111. The SHAREHOLDERS' control over OXYGEN CYPRUS is further established by the evidence described above, including the May 7, 2024 email in which Co-Conspirator-1 threatened to replace Co-Conspirator-5 as director of OXYGEN CYPRUS, and by the SHAREHOLDER Documents, in which the

SHAREHOLDERS discussed OXYGEN CYPRUS as a component of CO3 whose structure allowed them to "obfuscate their ownership."

112. As set forth in Section D above, OXYGEN CYPRUS did not develop the FORENSIC SOFTWARE and employed no software developers.

113. In the SHAREHOLDER Document titled "Генштаб, 29 марта 2022" (General Staff, March 29, 2022), the SHAREHOLDERS discussed the difficulties that U.S. and international sanctions created for moving money in two steps: first from OXYGEN US to OXYGEN CYPRUS, and then from OXYGEN CYPRUS to the SHAREHOLDERS. The document reflects the SHAREHOLDERS' understanding, at the outset of the charged period, that OXYGEN CYPRUS was the intermediate stop on the path by which OXYGEN US's revenue reached them.

114. On February 2, 2023, REIBER emailed Co-Conspirator-1 and Co-Conspirator-2, at their oxygen-forensic.com addresses, in an email titled "Expenses." REIBER wrote that because of "US sanction to any Russian, now along with our US Commerce scrutiny on exports, OFI must cease reimbursing expenses to you both," and stated that their future expenses should instead be reimbursed by OXYGEN CYPRUS. In a follow-up email the next day, REIBER told Co-Conspirator-2 that the change was necessary because of "audit exposure."

115. The SHAREHOLDERS enforced the payments against REIBER personally. On May 7, 2024, Co-Conspirator-1 emailed REIBER and Co-Conspirator-5, warning that the SHAREHOLDERS would replace them both if they could not resolve delays in transferring funds from the United States to Cyprus. Co-Conspirator-1 criticized REIBER for failing to pay OXYGEN CYPRUS's invoices on time and Co-Conspirator-5 for "choosing stupid banks that delay payments," and concluded: "I'm tired of explaining to both of you that on-time payments are vital," because OXYGEN CYPRUS only had "money for little more than one month's salary for employees" on hand.

116. In April 2024, in the email thread titled "Summary for 2024-04 Management meeting," Co-Conspirator-1 informed REIBER that the SHAREHOLDERS were freezing his salary until OXYGEN US paid all of its outstanding "debts" to OXYGEN CYPRUS. The SHAREHOLDERS thus treated the royalty invoices not as arm's-length license fees but as amounts owed to them, enforced against REIBER personally.

## VI. CONCLUSION

117. Based on the facts above, I respectfully submit that there is probable cause to believe that from at least March 2022 through the present, in the Central District of California and elsewhere, REIBER and DAVYDOV, together with others, conspired to commit wire fraud, namely, to obtain money and property from the U.S. GOVERNMENT CUSTOMERS by falsely representing, by means of interstate and foreign wires, that OXYGEN US was not owned or controlled by any foreign persons or entities, and that the FORENSIC SOFTWARE was developed in the United States.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 18th day of September, 2026.

Karen L. Stevenson

THE HON. KAREN STEVENSON
UNITED STATES MAGISTRATE JUDGE